**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------- x

WELLS FARGO BANK, NATIONAL ASSOCIATION, AS
TRUSTEE FOR THE REGISTERED HOLDERS OF
MORGAN STANLEY CAPITAL I INC., COMMERCIAL
MORTGAGE PASSTHROUGH
CERTIFICATES, SERIES 2011-Cl, ACTING BY AND
THROUGH ITS SPECIAL SERVICER, TORCHLIGHT
LOAN SERVICES, LLC,

|  | Case No.: 1:20-cv-3586 |

Plaintiff,

**VERIFIED**
**FORECLOSURE COMPLAINT**

- against -

SUNSTONE 42ND STREET, LLC, SUNSTONE 42ND
STREET LESSEE, INC., JOHN DOE # 1 – 50, SAID JOHN
DOE DEFENDANTS # 1 – 50 BEING FICTITIOUS, IT
BEING INTENDED TO NAME AS DEFENDANTS ALL
PERSONS WHO MAY HAVE OBTAINED POSSESSION
OF OR OTHERWISE RECEIVED, CONTROLLED,
SPENT, CONVERTED, MISAPPROPRIATED OR
OTHERWISE TAKEN ANY RENTS ON OR AFTER THE
OCCURRENCE OF AN EVENT OF DEFAULT, AND
JOHN DOE # 51 – 100, SAID JOHN DOE DEFENDANTS
# 51 – 100 BEING FICTITIOUS, IT BEING INTENDED
TO NAME ALL OTHER PARTIES WHO MAY HAVE
SOME INTEREST IN OR LIEN UPON THE PREMISES
SOUGHT TO BE FORECLOSED,

Defendants.

------------------------------------------------------------------------- x

Plaintiff, Wells Fargo Bank, National Association, as Trustee for the Registered

Holders of Morgan Stanley Capital I Inc., Commercial Mortgage Pass-Through Certificates,

Series 2011-C1 ("Plaintiff" or "Lender"), acting by and through its Special Servicer, Torchlight

Loan Services, LLC and by its attorneys Allegaert Berger & Vogel LLP, complaining of the

defendants herein, alleges as follows:

## THE PARTIES

1.      Plaintiff is a national banking association with its designated main office in, and is a citizen of, the State of South Dakota.

2.      Plaintiff is the owner and record holder of that certain Consolidated, Amended and Restated Promissory Note (the "Note"), the Mortgage and that certain Assignment of Leases and Rents (the "AL&R"), each as more particularly defined and described below, which affects, among other things, improved real property and improvements located in New York County known as 234 West 42nd Street, New York, New York 10036 as more particularly set forth on **Schedule A** annexed hereto and incorporated by reference herein.

3.      Upon information and belief, at all relevant times, Defendant Sunstone 42nd Street, LLC ("Borrower"):  (a) was and is a limited liability company organized and existing under the laws of the State of Delaware; (b) has maintained and still maintains a principal place of business located at c/o Sunstone Hotel Investors, Inc., 200 Spectrum Center Drive, 21st Floor, Irvine, California 92618; and (c) was and still is the owner of the Property (as defined in the Mortgage), which is operated as the Hilton Times Square Hotel (the "Hotel") located in the City of New York, New York County, State of New York, and is known as 234 West 42nd Street, New York, New York 10036, and is more particularly described below.

4.      Upon information and belief, at all relevant times, Defendant Sunstone 42nd Street Lessee, Inc. ("Operating Lessee; collectively with Borrower, "Mortgagor"):  (a) was and is a corporation organized and existing under the laws of the State of Delaware; (b) has maintained and still maintains a principal place of business located at c/o Sunstone Hotel Investors, Inc., 200 Spectrum Center Drive, 21st Floor, Irvine, California 92618; and (c) was and still is the operating lessee of the Property.  Borrower, as lessor, and Operating Lessee, as lessee, are parties to that certain Lease Agreement, dated as of March 17, 2006 (as heretofore amended and as the

same may be further amended, the "Operating Lease"), pursuant to which Operating Lessee leases and operates the Property.

5.     Defendants John Doe #1 through John Doe #50 (fictitious names) are named as defendants to represent all persons who may have obtained possession of or otherwise received, controlled, spent, converted, misappropriated or otherwise taken any Rents on or after the occurrence of an Event of Default.

6.     Defendants John Doe #51 through John Doe #100 (fictitious names) are named as defendants to represent all other parties, including, without limitation, tenants or other occupants, who may have some interest in or lien upon the Property subordinate to the lien of the Plaintiff's Mortgage sought to be foreclosed.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) in that this action is between citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest, costs and attorneys' fees.

8.     Plaintiff is a national banking association and, pursuant to 28 U.S.C. § 1348, is a citizen and resident of South Dakota.

9.     Based upon Plaintiff's investigation and upon information and belief, none of the defendants is a citizen or resident of South Dakota.

10.     This Court has jurisdiction over the Defendants.

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the Property (as defined below) that is the subject of this action is located in the Southern District of New York.

## PRELIMINARY STATEMENT

12.     While the Covid-19 pandemic has resulted in global illness and enormous hardship and suffering throughout the world, the United States and the State and City of New York have been particularly hard hit.  As the Court is well aware, the City of New York is essentially on complete and total lock-down, and virtually all non-essential travel and other economic activity has stopped.

13.     The Property operates as the Hilton Times Square Hotel (the "Hotel").  Upon information and belief, the Hotel was operating at approximately ninety-seven percent occupancy as recently as February of this year.  Upon information and belief, the current occupancy of the Hotel is now one percent or less.   As a result, the Hotel is currently generating virtually no operating revenues.

14.     Notwithstanding the cessation of operating revenues, upon information and belief there are substantial and immediate expenses that will need to be funded immediately and in the near future.  Upon information and belief, Borrower and Mortgagor lack any unencumbered funds to do so.  All of the funds held by Borrower and/or Mortgagor are subject to Plaintiff's mortgage liens and security interests.

15.     Accordingly, the only sources of funds to pay these expenses are (a) any funds held by Borrower and Mortgagor, all of which are subject to Plaintiff's liens and security interests, (b) funds held in reserve by Plaintiff in accordance with the Loan Documents and (c) any advances that Plaintiff elects, in its discretion, to make to Borrower and Mortgagor.[1]  While the precise amount required cannot be currently determined, upon information belief the aggregate amount is likely to be in the millions of dollars.

---

[1]   *See* Mortgage § 8.3 (*infra*).

16.     Given that the continued lockdown and the concomitant dramatic reduction in the Hotel's occupancy and revenues has almost certainly had, and will likely continue to have, a significant negative effect on the value of the aggregate collateral securing the Loan (as defined below) held by Plaintiff.  Accordingly, an essential element of Plaintiff's willingness to release funds from reserves and/or make advances depends upon the prompt appointment of a receiver, who appointment will provide additional security with respect to such funds.  As set forth in more detail in paragraph 46 below, the Mortgage expressly provides for the appointment of a receiver.

17.     Plaintiff has engaged in extensive discussions with Borrower and Mortgagor prior to the commencement of this action.  As a result of these discussions and in consideration of the terms and provisions set forth in the Stipulation (as defined below), Borrower and Mortgagor have agreed to the immediate appointment of a receiver, as more particularly set forth in that certain Stipulation by and between Plaintiff and Borrower and Mortgagor (the "Stipulation").

## FACTS

**THE LOAN, THE NOTE, THE LOAN AGREEMENT AND THE MORTGAGE**

18.     By Loan Agreement dated as of November 1, 2010 (the "Loan Agreement"), Merrill Lynch Mortgage Lending Inc. (the "Original Lender") made a loan (the "Loan") in the original principal amount of $92,500,000 (ninety-two million and five hundred thousand dollars) to Borrower, as evidenced by, among other things, that certain Consolidated, Amended and Restated Promissory Note dated as of November 1, 2010 (the "Note").

19.     At the time of the making of the Loan, Original Lender was the owner and holder of certain mortgages ("Existing Mortgages") and of the notes, bonds or other obligations secured thereby (hereinafter referred to as the "Original Notes"), as more particularly described in the

loan documents (the "Loan Documents"), evidencing indebtedness in the unpaid principal aggregate amount of $81,000,000 (eighty-one million dollars).

20.     Each of the Original Notes and the Existing Indebtedness evidenced thereby was secured by certain Existing Mortgages, as more particularly described below.

21.     A Building Loan Mortgage and Security Agreement, dated as of November 13, 1998, was made by FC 42 Hotel LLC ("FC 42 Hotel") to Credit Lyonnais New York Branch, its successors and assigns, as co-agent and administrative agent for Credit Lyonnais New York Branch and Bayerische Hypo-und Vereinsbank AG acting through its New York Branch, and Bayerische Hypo-und Vereinsbank AG acting through its New York Branch, its successors and assigns, as co-agent for Credit Lyonnais New York Branch and Bayerische Hypo-und Vereinsbank AG acting through its New York Branch, and was recorded on January 6, 1999, in the Office of the New York City Register, New York County (the "Office of the New York City Register"), in Reel 2788, page 811 ("Mortgage A"), and the note therein referred to, which said note and mortgage were given to secure payment of the principal sum of $42,780,552, with interest thereof at the rate specified in said note.

22.     Mortgage A was assigned by Credit Lyonnais New York Branch, as co-agent and Bayerische Hypo-und Vereinsbank AG acting through its New York Branch, as coagent to Bank of America, N.A. ("BOA") by an Assignment of Building Loan Mortgage and Security Agreement, dated as of October 19, 2000 and was recorded on November 22, 2000, in the Office of the New York City Register, in Reel 3194, page 1200.

23.     A Project Loan Mortgage and Security Agreement, dated as of November 13, 1998, was made by FC 42 Hotel to Credit Lyonnais New York Branch, its successors and assigns, as coagent and administrative agent for Credit Lyonnais New York Branch and

Bayerische Hypo-und Vereinsbank AG acting through its New York Branch, and Bayerische Hypo-und Vereinsbank AG acting through its New York Branch, its successors and assigns, as co-agent for Credit Lyonnais New York Branch and Bayerische Hypo-und Vereinsbank AG acting through its New York Branch, and was recorded on January 6, 1999, in the Office of the New York City Register, in Reel 2788, page 883 ("Mortgage B"), and the note therein referred to, which said note and mortgage were given to secure payment of the principal sum of $30,884,448, with interest thereof at the rate specified in said note.

24.     Mortgage B was assigned by Credit Lyonnais New York Branch, as co-agent and Bayerische Hypo-und Vereinsbank AG acting through its New York Branch, as coagent to BOA by an Assignment of Project Loan Mortgage and Security Agreement, dated as of October 19, 2000 and recorded on November 22, 2000, in the Office of the New York City Register, in Reel 3194, page 1212.

25.     A Mortgage, dated as of October 19, 2000, was made by FC 42 Hotel to BOA, and recorded on November 22, 2000, in the Office of the New York City Register, in Reel 3194, page 1190 ("Mortgage C"), and the note therein referred to, which said note and mortgage were given to secure payment of the principal sum of $9,935,000, with interest thereof at the rate specified in said note.

26.     Mortgage A, Mortgage B and Mortgage C were consolidated to form a single lien of $83,600,000 by the terms of an Amended, Restated and Consolidated Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of October 19, 2000, by and between FC 42 Hotel and BOA, and recorded on November 22, 2000, in the Office of the New York City Register, in Reel 3194, page 1220.

27.     The consolidated Mortgage A, Mortgage B and Mortgage C was assigned by BOA to Bear Stearns Commercial Mortgage, Inc., by an Assignment of Mortgage, dated as of July 31, 2003, and recorded on November 6, 2003, in the Office of the New York City Register, under CRFN 2003000446624.

28.     The consolidated Mortgage A, Mortgage B and Mortgage C was amended and restated as a lien of $49,000,000 by the terms of a Consolidated, Amended and Restated Leasehold Mortgage and Security Agreement dated as of August 6, 2003, by and between FC 42 Hotel LLC and Bear Stearns Commercial Mortgage, Inc. and recorded on November 6, 2003, in the Office of the New York City Register under CRFN 2003000446625.

29.     The consolidated Mortgage A, Mortgage B and Mortgage C was modified and reduced to a lien of $42,874,504 by the terms of an Agreement of Modification and Reduction of Leasehold Mortgage and Note dated as of November 1, 2003, by and between FC 42 Hotel LLC and Bear Stearns Commercial Mortgage, Inc. and recorded on July 8, 2004 in the Office of the New York City Register under CRFN 2004000424102.

30.     The consolidated Mortgage A, Mortgage B and Mortgage C was assigned by Bear Steams Commercial Mortgage, Inc. to Wells Fargo Bank Minnesota, N.A., as Trustee for the benefit of the Holders of Banc of America Large Loan Inc., Commercial Mortgage Pass-Through Certificates, Series 2003-BBA2, by an Assignment of Consolidated, Amended and Restated Leasehold Mortgage and Security Agreement dated as of August 6, 2003, and recorded on March 26, 2004 in the Office of the New York City Register under CRFN 2004000184915, as corrected by Correction Assignment of Consolidated, Amended and Restated Leasehold Mortgage and Security Agreement dated as of November 1, 2003, between Bear Stearns Commercial Mortgage, Inc. and Wells Fargo Bank Minnesota, N.A., as Trustee for the benefit of the Holders

of Banc of America Large Loan Inc., Commercial Mortgage Pass-Through Certificates, Series 2003-BBA2, and recorded on February 28, 2006 in the Office of the New York City Register under CRFN 2006000113251.

31.     The consolidated Mortgage A, Mortgage Band Mortgage C was assigned by Wells Fargo Bank, N.A. f/k/a Wells Fargo Bank Minnesota, N.A., as Trustee for the benefit of the Holders of Banc of America Large Loan Inc., Commercial Mortgage Pass-Through Certificates, Series 2003-BBA2, to Mortgage Electronic Registration Systems, Inc., as nominee for Bank of America, N.A., dated as of November l 0, 2005, and recorded on February 28, 2006 in the Office of the New York City Register under CRFN 2006000113252.

32.     Gap Leasehold Mortgage and Security Agreement dated as of November 10, 2005, was made by FC 42 Hotel LLC to Mortgage Electronic Registration Systems, Inc., as nominee for Bank of America, N.A., and recorded on February 28, 2006 in the Office of the New York City Register under CRFN 2006000113254 ("Mortgage D"), and the note therein referred to, which said note and mortgage were given to secure payment of the principal sum of $39,107,208.48 with interest thereof at the rate specified in said note.

33.     Mortgage A, Mortgage B, Mortgage C and Mortgage D were consolidated to form a single lien of $81,000,000 by the terms of a Consolidated, Amended and Restated Leasehold Mortgage and Security Agreement, dated as of November 10, 2005, by and between FC 42 Hotel LLC to Mortgage Electronic Registration Systems, Inc., as nominee for BOA, and recorded on February 28, 2006 in the Office of the New York City Register under CRFN 2006000113255.

34.     The consolidated Mortgage A, Mortgage B, Mortgage C Mortgage D was assigned by Mortgage Electronic Registration Systems, Inc., as nominee for BOA, to Mortgage Electronic Registration Systems, Inc., as nominee for Wells Fargo Bank, N.A., as Trustee for the

Holders of GE Commercial Mortgage Corporation Commercial Mortgage Pass-Through Certificates, Series 2005-C4 by Assignment of Consolidated, Amended and Restated Leasehold Mortgage and Security Agreement, executed as of October 27, 2010, but effective December 14, 2005, and recorded on November 15, 2010 in the in the Office of the New York City Register under CRFN 2010000382123.

35.     The consolidated Mortgage A, Mortgage B, Mortgage C and Mortgage D was assumed by Defendant Sunstone 42nd Street, LLC, by that certain Loan Assumption Agreement, dated March 17, 2006, by and among Sunstone 42nd Street, LLC and Wells Fargo Bank, N.A., as Trustee for the Registered Holders of GE Commercial Mortgage Corporation Commercial Mortgage Pass-Through Certificates, Series 2005-C4 and Mortgage Electronic Registration Systems, Inc., as nominee for Wells Fargo Bank, N.A., as Trustee for the Registered Holders of GE Commercial Mortgage Corporation Commercial Mortgage Pass-Through Certificates, Series 2005-C4 and Mortgage Electronic Registration Systems, Inc., and recorded on April, 26, 2006 in the Office of the New York City Register under CRFN 2006000231325.

36.     Consolidated Mortgage A, Mortgage B, Mortgage C and Mortgage D was assigned by Wells Fargo Bank, N.A., as Trustee for the Registered Holders of GE Commercial Mortgage Corporation Commercial Mortgage Pass-Through Certificates, Series 2005-C4 and Mortgage Electronic Registration Systems, Inc., as nominee, to the Original Lender, by Assignment of Consolidated, Amended and Restated Leasehold Mortgage and Security Agreement, executed as of October 27, 2010 to be effective as of November 1, 2010 and recorded November 15, 2010 in the Office of the New York City Register; CFRN 2010000382125.

37.     A Gap Leasehold Mortgage and Security Agreement dated as of November 1, 2010, made by Sunstone 42nd Street, LLC, to the Original Lender, and recorded November 15, 2010 in the Office of the New York City Register and the note therein referred to, which said note and mortgage were given to secure payment of the principal sum of $11,500,000.00 with interest thereof at the rate specified in said note; CFRN 2010000382126.

38.     The above said Mortgages were consolidated by that certain Consolidated, Amended and Restated Leasehold Mortgage and Security Agreement between SUNSTONE 42ND STREET, LLC and SUNSTONE 42ND STREET LESSEE, INC. to the Original Lender to form a single lien in the amount of $92,500,000.00, dated as of November 1, 2010 and recorded on November 15, 2010 as CRFN 2010000382127 (the "Mortgage").

39.     The Mortgage was assigned by the Original Lender to BANK OF AMERICA MORTGAGE CAPITAL CORPORATION pursuant to that certain Assignment of Mortgage dated March 8, 2011 and recorded on April 1, 2011, as CRFN 2011000118307 with the Office of the New York City Register.

40.     The Mortgage was assigned by BANK OF AMERICA MORTGAGE CAPITAL CORPORATION to Plaintiff pursuant to that certain Assignment of Mortgage dated March 8, 2011 and recorded on April 1, 2011, as CFRN 2011000144543 with the Office of the New York City Register.

**THE ASSIGNMENT OF LEASES AND RENTS**

41.     Consistent with the terms of the Loan Agreement, Mortgagor executed and delivered to the Original Lender an Assignment of Leases and Rents (the "AL&R") dated as of November 1, 2010, recorded in the Office of the New York City Register on November 15,

2010, under CRFN 2010000382128, pursuant to which Mortgagor assigned all of Mortgagor's interest in and to the Leases and Rents of the Property as security for the Loan.

42.     On or about March 8, 2011, the Original Lender executed and delivered to BANK OF AMERICA MORTGAGE CAPITAL CORPORATION the Assignment of Assignment of Leases and Rents, recorded in the Office of the New York City Register on April 1, 2011, under CRFN 2011000118308, as such, effective as of February 28, 2011, the Original Lender's right, title and interest under the AL&R are granted and assigned to BANK OF AMERICA MORTGAGE CAPITAL CORPORATION.

43.     On or about March 8, 2011, BANK OF AMERICA MORTGAGE CAPITAL CORPORATION executed and delivered to Plaintiff the Assignment of Assignment of Leases and Rents, recorded in the Office of the New York City Register on April 20, 2011, under CRFN 2011000144544, as such, effective as of February 28, 2011, the Original Lender's right, title and interest under the AL&R are granted and assigned to Plaintiff.

**PERTINENT TERMS OF THE NOTE, THE LOAN AGREEMENT, THE MORTGAGE, THE ASSIGNEMENT OF LEASES AND RENTS**

44.     The Note provides, *inter alia*:

A. The Original Notes are hereby combined and consolidated so that together they shall hereafter constitute in law but one note evidenced by this Note in the aggregate principal amount of NINETY-TWO MILLION FIVE HUNDRED THOUSAND and No/100 Dollars ($92,500,000.00), together with interest thereon as hereinafter provided.

B. The Original Notes are hereby consolidated, amended and restated in their entirety to read as follows:

### Article 1: Payment Terms

Borrower agrees to pay the principal sum of this Note and interest on the unpaid principal sum of this Note from time to time outstanding at the rate and at the times specified in Section 2 of the Loan Agreement and the outstanding balance of the principal sum of this Note and all accrued and unpaid interest thereon shall be due and payable on the Maturity Date.

### Article 2:  Default and Acceleration

The Debt shall without notice become immediately due and payable at the option of Lender if any payment required in this Note is not paid on or prior to the date when due or if not paid on the Maturity Date or on the happening of any other Event of Default.

### Article 3:  Loan Documents

This Note is secured by the Mortgage and the other Loan Documents.  All of the terms, covenants and conditions contained in the Loan Agreement, the Mortgage and the other Loan Documents are hereby made part of this Note . . . .

45.     The Loan Agreement provides, *inter alia*:

### ARTICLE I
### DEFINITIONS; PRINCIPLES OF CONSTRUCTION

**Section 1.1 Definitions.**

***

**"Debt"** shall mean the outstanding principal amount set forth in, and evidenced by, this Agreement and the Note together with all interest accrued and unpaid thereon and all other sums due to Lender in respect of the Loan under the Note, this Agreement, the Mortgage or any other Loan Document.

***

**"Default Rate"** shall mean, with respect to the Loan, a rate per annum equal to the lesser of (a) the maximum rate permitted by applicable law, or (b) four percent (4%) above the Note Rate.

***

**"Lien"** shall mean any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting Borrower, Operating Lessee, the Property, any portion thereof or any interest therein, including, without limitation, any federal tax lien filed against Borrower, any member or general partner of Borrower, or any SPE Component Entity (if any) or the Property, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

***

"**Maturity Date**" shall mean November 1, 2020.

\*\*\*

"**Note Rate**" shall mean an interest rate equal to 4.97% per annum.

\*\*\*

"**Rents**" shall mean, all rents, rent equivalents, moneys payable as damages or in lieu of rent or rent equivalents, royalties (including, without limitation, all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, revenues, deposits (including, without limitation, security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower or Operating Lessee or their respective agents or employees from any and all sources arising from or attributable to the Property, and proceeds, if any, from business interruption or other loss of income or insurance, including, without limitation, all hotel receipts, revenues and credit card receipts collected from guest rooms, restaurants, bars, meeting rooms, banquet rooms and recreational facilities, all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of property or rendering of services by Borrower or Operating Lessee or any operator or manager of the hotel or the commercial space located in the Improvements or acquired from others (including, without limitation, from the rental of any office space, retail space, guest rooms or other space, halls, stores, and offices, and deposits securing reservations of such space), license, lease, sublease and concession fees and rentals, health club membership fees, food and beverage wholesale and retail sales, service charges, vending machine sales and proceeds, if any, from business interruption or other loss of income insurance.

## ARTICLE II
## GENERAL TERMS

\*\*\*

**Section 2.2 <u>Loan Payment</u>**.  (a) The Loan shall bear interest at a fixed rate per annum equal to the Note Rate. Interest shall be computed based on the daily rate produced assuming a three hundred sixty (360) day year, multiplied by the actual number of days elapsed. Except as otherwise set forth in this Agreement, interest shall be paid in arrears.

(b)  Borrower hereby agrees to pay sums due under the Note as follows:  Except as may be adjusted in accordance with the last sentence of Section 2.2(c), the Monthly Payment Amount shall be payable pursuant to the terms of Section 2.2(d) on the first (1st) day of each month beginning on December 1, 2010 (each a "Scheduled Payment

Date") until the entire indebtedness evidenced hereby is fully paid, except that any remaining indebtedness, if not sooner paid, shall be due and payable on the Maturity Date.

***

(e) Prior to the occurrence of an Event of Default, all monthly payments made as scheduled under this Agreement and the Note shall be applied first to the payment of interest computed at the Note Rate, and the balance toward the reduction of the principal amount of the Note. All voluntary and involuntary prepayments on the Note shall be applied, to the extent thereof, to accrued but unpaid interest on the amount prepaid, to the remaining principal amount, and any other sums due and unpaid to Lender in connection with the Loan, in such manner and order as Lender may elect in its sole and absolute discretion, including, but not limited to, application to principal installments in inverse order of maturity. Following the occurrence of an Event of Default, any payment made on the Note shall be applied to accrued but unpaid interest, late charges, accrued fees, the unpaid principal amount of the Note, and any other sums due and unpaid to Lender in connection with the Loan, in such manner and order as Lender may elect in its sole and absolute discretion.

***

**Section 2.3 <u>Late Payment Charge</u>**.  If the Monthly Payment Amount (excluding the outstanding principal amount due on the Maturity Date) is not paid by Borrower on or prior to the date after the same is due (after taking into account the payment date convention set forth in Section 2.2(d)), Borrower shall pay to Lender upon demand an amount equal to the lesser of four percent (4%) of such unpaid sum or the maximum amount permitted by applicable law in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment. Any such amount shall be secured by the Mortgage and the other Loan Documents to the extent permitted by applicable law.

**Section 2.5 <u>Payments after Default</u>**.  Upon the occurrence and during the continuance of an Event of Default, interest on the outstanding principal balance of the Loan and, to the extent permitted by law, overdue interest and other amounts due in respect of the Loan, (a) shall accrue at the Default Rate, and (b) Lender shall be entitled to receive and Borrower shall pay to Lender all cash flow from the Property in accordance with the terms of the Deposit Account Agreement, such amount to be applied by Lender to the payment of the Debt in such order as Lender shall determine in its sole discretion, including, without limitation, alternating applications thereof between interest and principal. Interest at the Default Rate shall be computed from the occurrence of the Event of Default until the earlier of (i) the actual receipt and collection of the Debt ( or that portion thereof that is then due) and (ii) the cure of such Event of Default. To the extent permitted by applicable law, interest at the Default Rate shall be added to the Debt, shall itself accrue interest at the same rate as the Loan and shall be secured

15

by the Mortgage. This paragraph shall not be construed as an agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default; the acceptance of any payment from Borrower shall not be deemed to cure or constitute a waiver of any Event of Default; and Lender retains its rights under this Agreement to accelerate and to continue to demand payment of the Debt upon the happening and during the continuance of any Event of Default, despite any payment by Borrower to Lender.

\*\*\*

## ARTICLE 5
## BORROWER COVENANTS

\*\*\*

**Section 5.7 <u>Notice of Default</u>**.  Borrower shall promptly advise Lender of any material adverse change in the condition (financial or otherwise) of Borrower, Operating Lessee, Borrower Principal or the Property or of the occurrence of any Default or Event of Default of which Borrower has knowledge.

\*\*\*

## ARTICLE 11
## EVENTS OF DEFAULT; REMEDIES

**Section 11.1 <u>Event of Default</u>**.  The occurrence of any one or more of the Following events shall constitute an "Event of Default":

(a) if any portion of the Debt is not paid on or prior to the date the same is due (or two (2) days after the date that the same is due once during any twelve (12) month period) or if the entire Debt is not paid on or before the Maturity Date; provided, however, Borrower shall not be in default so long as there is sufficient money in the Deposit Account for payment of all amounts then due and payable (including any deposits into Reserve Accounts) and Lender's access to such money has not been constrained or constricted in any manner, other than pursuant to the Loan Documents;

(b) except as otherwise expressly provided in the Loan Documents, if any of the Taxes or Other Charges are not paid when the same are due and payable, unless there is sufficient money in the Tax and Insurance Reserve Account for payment of amounts then due and payable and Lender's access to such money has not been constrained or restricted in any manner;

\*\*\*

(f) if (i) Borrower, or any managing member or general partner of Borrower, Borrower Principal, Operating Lessee or any SPE Component Entity (if any) shall commence any case, proceeding or other action (A) under any Creditors Rights Laws, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or Borrower, any managing member or general partner of Borrower, Borrower Principal, Operating Lessee or any SPE Component Entity (if any) shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against Borrower, any managing member or general partner of Borrower, Borrower Principal, Operating Lessee or any SPE Component Entity (if any) any case, proceeding or other action of a nature referred to in clause (i) above which (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of ninety (90) days; or (iii) there shall be commenced against Borrower, any managing member or general partner of Borrower, Borrower Principal, Operating Lessee or any SPE Component Entity (if any) any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of any order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within ninety (90) days from the entry thereof; or (iv) Borrower, any managing member or general partner of Borrower, Borrower Principal, Operating Lessee or any SPE Component Entity (if any) shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; or (v) Borrower, any managing member or general partner of Borrower, Borrower Principal, Operating Lessee or any SPE Component Entity (if any) shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due;

***

(j) if Borrower shall continue to be in default under any other term, covenant or condition of this Agreement or any of the Loan Documents for more than ten (10) days after notice from Lender in the case of any default which can be cured by the payment of a sum of money or for thirty (30) days after notice from Lender in the case of any other default, provided that if such default cannot reasonably be cured within such thirty (30) day period and Borrower shall have commenced to cure such default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for so long as it shall require Borrower in the exercise of due diligence to cure such default, it being agreed that no such extension shall be for a period in excess of one hundred twenty (120) days;

(k) if Borrower or Operating Lessee ceases to do business as a hotel at the Property or terminates such business for any reason whatsoever (other than

temporary cessation in connection with any continuous and diligent renovation or restoration of the Property following a Casualty or Condemnation);

\*\*\*

    **Section 11.2 <u>Remedies</u>.**  (a) Upon the occurrence of an Event of Default (other than an Event of Default described in Section 11. l(f) above) and at any time thereafter, Lender may, in addition to any other rights or remedies available to it pursuant to this Agreement and the other Loan Documents or at law or in equity, take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in the Property, including, without limitation, declaring the Debt to be immediately due and payable, and Lender may enforce or avail itself of any or all rights or remedies provided in the Loan Documents against Borrower and the Property, including, without limitation, all rights or remedies available at law or in equity . . . .

    (b) Upon the occurrence of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents with respect to the Property. Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singularly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth herein or in the other Loan Documents.

\*\*\*

**ARTICLE 15**
**EXCULPATION**

    **Section 15.1 <u>Exculpation</u>**.  (a) Notwithstanding anything to the contrary provided herein or in the other Loan Documents, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained herein or in the other Loan Documents by any action or proceeding wherein a money judgment shall be sought against Borrower, except that Lender may bring a foreclosure action, action for specific performance or other appropriate action or proceeding against Borrower or Operating Lessee to enable Lender to enforce and realize upon this Agreement, the Note, the Mortgage and the other Loan Documents, and the interest in the Property, the Rents and any other collateral given to Lender created by this Agreement, the Note, the Mortgage and the other Loan Documents (in each case, to the extent of the

interest of Borrower and/or Operating Lessee therein, and only to the extent that the interests thereof have been pledged and currently serve as security pursuant to the Loan Documents); provided, however, that any judgment in any such action or proceeding shall be enforceable Against Borrower or Operating Lessee, as applicable, only to the extent of Borrower's or Operating Lessee's, as applicable, interest in the Property, in the Rents and in any other collateral given to Lender. Lender, by accepting this Agreement, the Note, the Mortgage and the other Loan Documents, agrees that it shall not, except as otherwise provided in this Section 15.1, sue for, seek or demand any deficiency judgment against Borrower or Operating Lessee in any such action or proceeding, under or by reason of or under or in connection with this Agreement, the Note, the Mortgage or the other Loan Documents. The provisions of this Section 15.1 shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by this Agreement, the Note, the Mortgage or the other Loan Documents; (ii) impair the right of Lender to name Borrower or Operating Lessee, as applicable, as a party defendant in any action or suit for judicial foreclosure and sale under this Agreement and the Mortgage; (iii) affect the validity or enforceability of any indemnity (including, without limitation, those contained in the Environmental Indemnity, Section 13.5 and Article 14 of this Agreement), guaranty, master lease or similar instrument made in connection with this Agreement, the Note, the Mortgage and the other Loan Documents; (iv) impair the right of Lender to obtain the appointment of a receiver; (v) impair the enforcement of the assignment of leases provisions contained in the Mortgage; or (vi) impair the right of Lender to obtain a deficiency judgment or other judgment on the Note against Borrower or Operating Lessee, as applicable, if necessary to obtain any Insurance Proceeds or Awards to which Lender would otherwise be entitled under this Agreement; provided however, Lender shall only enforce such judgment to the extent of the Insurance Proceeds and/or Awards. Notwithstanding anything to the contrary contained herein, in no event shall the direct or indirect members or principals of Borrower be personally liable under this Section or any of the Loan Documents.

\*\*\*

## ARTICLE 17
## FURTHER ASSURANCES

\*\*\*

**Section 17.5 Expenses.**  Except as specifically set forth in this Agreement, Borrower covenants and agrees to pay or, if Borrower fails to pay, to reimburse, Lender upon receipt of written notice from Lender for all reasonable costs and expenses (including reasonable, actual attorneys' fees and disbursements reasonably incurred by Lender in accordance with this Agreement (all of which shall be deemed part of the Debt) in connection with (a) the preparation, negotiation, execution and delivery of this Agreement and the other Loan Documents and the consummation of the transactions contemplated hereby and thereby and all the costs of furnishing all opinions by counsel for Borrower (including without limitation any opinions reasonably requested by Lender as to

any legal matters arising under this Agreement or the other Loan Documents with respect to the Property); (b) Borrower's ongoing performance of and compliance with Borrower's respective agreements and covenants contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date, including, without limitation, confirming compliance with environmental and insurance requirements; (c) following a request by Borrower, Lender's ongoing performance and compliance with all agreements and conditions contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date; (d) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Agreement and the other Loan Documents and any other documents or matters requested by Lender subject to the expense limit provided for in Section 13.4(i); (e) securing Borrower's compliance with any requests made pursuant to the provisions of this Agreement; (f) the filing and recording fees and expenses, title insurance and reasonable fees and expenses of counsel for providing to Lender all required legal opinions, and other similar expenses incurred in creating and perfecting the Lien in favor of Lender pursuant to this Agreement and the other Loan Documents; (g) enforcing or preserving any rights, in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower, this Agreement, the other Loan Documents, the Property, or any other security given for the Loan; and (h) enforcing any obligations of or collecting any payments due from Borrower under this Agreement, the other Loan Documents or with respect to the Property or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or of any insolvency or bankruptcy proceedings; provided, however, that Borrower shall not be liable for the payment of any such costs and expenses to the extent the same arise by reason of the gross negligence, illegal acts, fraud or willful misconduct of Lender.

**Section 17.6 <u>Cost of Enforcement</u>.**

In the event (a) that the Mortgage is foreclosed in whole or in part, (b) of the bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of Borrower or any of its constituent Persons or an assignment by Borrower or any of its constituent Persons for the benefit of its creditors, or (c) Lender exercises any of its other remedies under this Agreement or any of the other Loan Documents, in each case pursuant to the terms and conditions of the Loan Documents and applicable law, Borrower shall be chargeable with and agrees to pay all costs of collection and defense, including attorneys' fees and costs, incurred by Lender or Borrower in connection therewith and in connection with any appellate proceeding or post-judgment action involved therein, together with all required service or use taxes, all of which shall be deemed part of the Debt. In addition, Borrower shall be responsible for any fees and expenses of any servicer and any third-party fees and expenses (including, without limitation, special servicing fees, work-out fees and attorneys fees and disbursements) in connection

with a prepayment, release of Property, assumption or modification of the Loan, special servicing or work-out of the Loan or enforcement of the Loan Documents.

46.    The Mortgage provides, *inter alia*:

## ARTICLE 1 – GRANTS OF SECURITY

**Section 1.1 <u>Property Mortgaged</u>**.  Mortgagor does hereby irrevocably mortgage, grant, bargain, sell, pledge, assign, warrant, transfer, convey and grant a security interest to Lender and its successors and assigns Mortgagor's interest in and to the following property, rights, interests and estates now owned, or hereafter acquired by Mortgagor (collectively, the "Property"):

(a) Land.  The leasehold estate of Borrower in the real property described in Exhibit A attached hereto and made a part hereof (the "Fee Land");

(b) Operating Lease. All of Operating Lessee's estate, right, title and interest in, and under the Operating Lease and the leasehold estate created thereby in the real property leased thereby (the "Operating Lease Land"), together with all buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs replacements now or hereafter erected on the Operating Lease Land and together with all appurtenances including, but not limited to (i) extension, renewal, modification and option rights, and all of the estate and right of Operating Lessee of, in, and to the Operating Lease Land under and by virtue of the Operating Lease, (ii) all credits to and deposits of Operating Lessee under the Operating Lease and all other options, privileges and rights granted and demised to Operating Lessee under the Operating Lease and (iii) all the right or privilege of Operating Lessee to terminate, cancel, surrender or merge the Operating Lease;

(c) Additional Land. All additional lands, estates and development rights hereafter acquired by Mortgagor for use in connection with the Fee Land or the Operating Lease Land (the Fee Land and the Operating Lease Land being hereinafter collectively referred to as the "Land") and the development of the Land and all additional lands and estates therein which may, from time to time, by supplemental mortgage or otherwise be expressly made subject to the lien of this Security Instrument;

(d) Improvements. The buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter erected or located on the Land (collectively, the "Improvements");

(e) Easements. All easements, rights-of-way or use, rights, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, and all estates, rights, titles, interests, privileges, liberties, servitudes, tenements, hereditaments and

appurtenances of any nature whatsoever, in any way now or hereafter belonging, relating or pertaining to the Land and the Improvements and the reversions and remainders, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof and all the estates, rights, titles, interests, rights of dower, rights of curtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Mortgagor of, in and to the Land and the Improvements and every part and parcel thereof, with the appurtenances thereto;

(f) Equipment. All "equipment," as such term is defined in Article 9 of the Uniform Commercial Code (as hereinafter defined), now owned or hereafter acquired by Mortgagor, which is used at or in connection with the Improvements or the Land or is located thereon or therein (including, but not limited to, all machinery, equipment, furnishings, and electronic data-processing and other office equipment now owned or hereafter acquired by Mortgagor and any and all additions, substitutions and replacements of any of the foregoing), together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto (collectively, the "Equipment"). Notwithstanding the foregoing, Equipment shall not include any property belonging to tenants under leases or any property owned by lessors under any leases between such lessors and Mortgagor, except in each case, to the extent that Mortgagor shall have any right or interest therein;

(g) Fixtures. All Equipment now owned, or the ownership of which is hereafter acquired, by Mortgagor which is so related to the Land and Improvements forming part of the Property that it is deemed fixtures or real property under the law of the particular state in which the Equipment is located, including, without limitation, all building or construction materials intended for construction, reconstruction, alteration or repair of or installation on the Property, construction equipment, appliances, machinery, plant equipment, fittings, apparatuses, fixtures and other items now or hereafter attached to, installed in or used in connection with (temporarily or permanently) any of the Improvements or the Land, including, but not limited to, engines, devices for the operation of pumps, pipes, plumbing, call and sprinkler systems, fire extinguishing apparatuses and equipment, heating, ventilating, incinerating, electrical, air conditioning and air cooling equipment and systems, gas and electric machinery, appurtenances and equipment, pollution control equipment, security systems, disposals, dishwashers, refrigerators and ranges, recreational equipment and facilities of all kinds, and water, gas, electrical, storm and sanitary sewer facilities, utility lines and equipment (whether owned individually or jointly with others, and, if owned jointly, to the extent of Mortgagor's interest therein) and all other utilities whether or not situated in easements, all water tanks, water supply, water power sites, fuel stations, fuel tanks, fuel supply, and all other structures, together with all accessions, appurtenances, additions, replacements, betterments and substitutions for any of the foregoing and the proceeds thereof (collectively, the "Fixtures"). Notwithstanding the foregoing, "Fixtures" shall not include any property which

tenants are entitled to remove pursuant to leases or any property owned by lessors under any leases between such lessors and Mortgagor, except in each case, to the extent that Mortgagor shall have any right or interest therein;

(h) Personal Property. All furniture, furnishings, objects of art, machinery, goods, tools, supplies, appliances, general intangibles, contract rights, accounts, accounts receivable, franchises, licenses, certificates and permits, inventory and articles of personal property and accessions thereof and renewals and replacements thereof and substitutions therefor, if any (including, but not limited to, beds, bureaus, chiffoniers, chests, chairs, desks, lamps, mirrors, bookcases, tables, rugs, carpeting, drapes, draperies, curtains, shades, venetian blinds, screens, paintings, hangings, pictures, divans, couches, luggage carts, luggage racks, stools, sofas, chinaware, linens, pillows, blankets, glassware, foodcarts, cookware, dry cleaning facilities, dining room wagons, keys or other entry systems, liquor and other drink dispensers, icemakers, radios, television sets, intercom and paging equipment, electric and electronic equipment, dictating equipment, private telephone systems, medical equipment, potted plants, fire prevention and extinguishing apparatus, fittings, plants, apparatus, stoves, ranges, refrigerators, laundry machines, tools, machinery, engines, dynamos, motors, switchboards, conduits, compressors, vacuum cleaning systems, floor cleaning, waxing and polishing equipment, call systems, brackets, electrical signs, bulbs, bells, ash and fuel, conveyors, cabinets, lockers, shelving, spotlighting equipment, dishwashers, garbage disposals, washers and dryers), other customary hotel equipment and all other personal property of any kind or character whatsoever as defined in and subject to the provisions of the Uniform Commercial Code, whether tangible or intangible (other than Fixtures), including, without limitation, "Inventories of Merchandise" and "Inventories of Supplies" as defined in the Uniform Commercial Code, which are now or hereafter owned by Mortgagor and which are located within or about the Land and the Improvements, together with all accessories, replacements and substitutions thereto or therefor and the proceeds thereof (collectively, the "Personal Property"), and the right, title and interest of Mortgagor in and to any of the Personal Property which may be subject to any security interests, as defined in the Uniform Commercial Code, as adopted and enacted by the state where any of the Property is located (the "Uniform Commercial Code"), superior in lien to the lien of this Security Instrument and all proceeds and products of the above;

(i) Leases and Rents. All leases, subleases, subsubleases, lettings, licenses, concessions or other agreements (whether written or oral), including without limitation, the Operating Lease, pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of the Land and the Improvements, and every modification, amendment or other agreement relating to such leases, subleases, subsubleases, or other agreements entered into in connection with such leases, subleases, subsubleases, or other agreements and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto,

heretofore or hereafter entered into, whether before or after the filing by or against Mortgagor of any petition for relief under any Creditors Rights Laws (collectively, the "Leases") and all right, title and interest of Mortgagor, its successors and assigns therein and thereunder, including, without limitation, cash or securities deposited thereunder to secure the performance by the lessees of their obligations thereunder and all rents, additional rents, rent equivalents, moneys payable as damages or in lieu of rent or rent equivalents, royalties (including, without limitation, all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, revenues, deposits (including, without limitation, security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Mortgagor or its agents or employees from any and all sources arising from or attributable to the Property, including, all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of property or rendering of services by Mortgagor or Manager and proceeds, if any, from business interruption or other loss of income insurance whether paid or accruing before or after the filing by or against Mortgagor of any petition for relief under any Creditors Rights Laws (collectively, the "Rents") and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt;

(j) Insurance Proceeds. All Insurance Proceeds in respect of the Property under any Policies covering the Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property, in each case as provided in the Loan Documents;

(k) Condemnation Awards. All Awards, including interest thereon, which may heretofore and hereafter be made with respect to the Property by reason of Condemnation, whether from the exercise of the right of eminent domain (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of the right), or for a change of grade, or for any other injury to or decrease in the value of the Property;

(l) Tax Certiorari. All refunds, rebates or credits in connection with reduction in real estate taxes and assessments charged against the Property as a result of tax certiorari or any applications or proceedings for reduction;

(m) Rights. The right, in the name and on behalf of Mortgagor, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Lender in the Property;

(n) Agreements. All agreements, contracts, certificates, instruments, franchises, permits, licenses, plans, specifications and other documents, now or hereafter entered into, and all rights therein and thereto, respecting or pertaining to the use, occupation, construction, management or operation of the Land and any part thereof and any Improvements or any business or activity conducted on the Land and any part thereof and all right, title and interest of Mortgagor therein and thereunder, including, without limitation, the right, upon the happening of any default hereunder, to receive and collect any sums payable to Mortgagor thereunder;

(o) Intangibles. All tradenames, trademarks, servicemarks, logos, copyrights, goodwill, books and records and all other general intangibles relating to or used in connection with the operation of the Property (to the extent of Mortgagor's interest in such items pursuant to and subject to the Franchise Agreement);

(p) Accounts. All reserves, escrows and deposit accounts maintained by Mortgagor with respect to the Property, including, without limitation, the Reserve Accounts and all accounts established pursuant to the Deposit Account Agreement, all cash, checks, drafts, certificates, securities, investment property, financial assets, instruments and other property held therein from time to time and all proceeds, products, distributions or dividends or substitutions thereon and thereof;

(q) Conversion. All proceeds of the conversion, voluntary or involuntary, of any of the foregoing items set forth in subsections (a) through (m) including, without limitation, Insurance Proceeds and Awards, into cash or liquidation claims;

(r) Ground Lease. That certain Agreement of Lease, dated as of November 5, 1998 (the "Sub-Lease") between New 42nd Street, Inc. ("New 42") and FC 42 Hotel LLC ("FC 42") (a memorandum of which, dated as of November 5, 1998, was recorded in the Office of the New York City Register, New York County, on January 6, 1999, in Reel 2788, Page 660) as the same was assigned by FC 42 to Borrower pursuant to that certain Assignment and Assumption of Ground Lease dated as of March 17, 2006 by and between FC 42, as assignor, and Borrower; which sublease covers a portion of the property demised pursuant to that certain Amended and Restated Agreement of Master Lease dated as of December 13, 1996 as amended by those certain letter agreements dated June 4, 1998 and June 16, 1998, that certain Amendment to the Amended and Restated Agreement of Master Lease dated as of June 30, 1998, and that certain Second Amendment to Amended and Restated Agreement of Master Lease, dated as of November 5, 1998 (as amended, the "Master Lease"), between 42nd St. Development Project, Inc. ("Fee Owner") and New 42 (a memorandum of which, dated June 30, 1998, was recorded in the Office of the City Register, New York County, on November 4, 1998 in Reel 2744, page 285); and (ii) that certain Agreement of Lease, dated

as of November 5, 1998 (the "Direct Lease"), between Fee Owner and FC 42 (a memorandum of which, dated as of November 5, 1998, was recorded in the Office of the New York City Register, New York County, on January 6, 1999, in Reel 2788, Page 562) as the same was assigned by FC 42 to Borrower pursuant to that certain Assignment and Assumption of Ground Lease dated as of March 17, 2006 by and between FC 42, as assignor, and Borrower, as assignee. The Master Lease, Sub-Lease and Direct Lease are collectively referred to herein as (the "Ground Lease");

(s) REA. That certain Declaration of Easement and Operating Agreement dated as of November 5, 1998, by and between The City of New York and. 42nd St. Development Project, Inc., a subsidiary of New York State Urban Development Corporation, d/b/a Empire State Development Corporation, and recorded in the Office of the New York City Register, New York County, on January 6, 1999, in Reel 2788, page 366 (the "REA"); and

(t) Other Rights. Any and all other rights of Mortgagor in and to the items set forth in Subsections (a) through (s) above.

**Section 1.2 Assignment of Rents**.  Mortgagor hereby absolutely and unconditionally assigns to Lender of Mortgagor's right, title and interest in and to all current and future Leases and Rents; it being intended by Mortgagor that this assignment constitutes a present, absolute assignment and not an assignment for additional security only. Nevertheless, subject to the terms of the Loan Agreement and Section 8.1 (h) of this Security Instrument, Lender grants to Mortgagor a revocable license to collect, receive, use and enjoy the Rents and Mortgagor shall hold the Rents, or a portion thereof sufficient to discharge all current sums due on the Debt, for use in the payment of such sums.

**Section 1.3 Security Agreement**.  This Security Instrument is both a real property mortgage and a "security agreement" within the meaning of the Uniform Commercial Code. The Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Mortgagor in the Property. By executing and delivering this Security Instrument, Mortgagor hereby grants to Lender, as security for the Obligations (hereinafter defined), a security interest in the Personal Property to the full extent that the Personal Property may be subject to the Uniform Commercial Code.

**Section 1.4 Fixture Filing**. Certain of the Property is or will become "fixtures" (as that term is defined in the Uniform Commercial Code) on the Land, and this Security Instrument, upon being filed for record in the real estate records of the city or county wherein such fixtures are situated, shall operate also as a financing statement filed as a fixture filing in accordance with the applicable provisions of said Uniform Commercial Code upon such of the Property that is or may become fixtures.

***

## ARTICLE 2 – DEBT AND OBLIGATIONS SECURED

**Section 2.1 Debt**.

      This Security Instrument and the grants, assignments and transfers made in Article 1 are given for the purpose of securing the Debt of the Borrower.

**Section 2.2 Other Obligations**.  This Security Instrument and the grants, assignments and transfers made in Article 1 are also given for the purpose of securing the performance of the following (the "Other Obligations"): (a) all other obligations of Borrower contained herein; (b) each obligation of Borrower contained in the Loan Agreement and any other Loan Document; and (c) each obligation of Borrower contained in any renewal, extension, amendment, modification, consolidation, change of, or substitution or replacement for, all or any part of the Note, the Loan Agreement or any other Loan Document.

**Section 2.3 Debt and Other Obligations**.  Borrower's obligations for the payment of the Debt and the performance of the Other Obligations shall be referred to collectively herein as the "Obligations."

**Section 2.4 Payment of Debt**.  Borrower will pay the Debt at the time and in the manner provided in the Loan Agreement, the Note and this Security Instrument.

**Section 2.5 Incorporation by Reference**.  All the covenants, conditions and agreements contained in (a) the Loan Agreement, (b) the Note and (c) all and any of the other Loan Documents, are hereby made a part of this Security Instrument to the same extent and with the same force as if fully set forth herein; provided, however, that any covenants, conditions and/or agreements made solely by Borrower in any other Loan Document shall not, by virtue of such incorporation by reference, be deemed to be made by Operating Lessee.

***

## ARTICLE 8 – RIGHTS AND REMEDIES UPON DEFAULT

**Section 8.1 Remedies**.  Upon the occurrence and during the continuance of any Event of Default beyond the expiration of any applicable and cure period, if any, Mortgagor agrees that Lender may take such action, without notice or demand, as it deems advisable to protect and enforce its rights against Mortgagor and in and to the Property, including, but not limited to, the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Lender may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Lender:

(a) declare the entire unpaid Debt to be immediately due and payable;

(b) institute proceedings, judicial or otherwise, for the complete foreclosure of this Security Instrument under any applicable provision of law, in which case the Property or any interest therein may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner;

(c) with or without entry, to the extent permitted and pursuant to the procedures provided by applicable law, institute proceedings for the partial foreclosure of this Security Instrument for the portion of the Debt then due and payable, subject to the continuing lien and security interest of this Security Instrument for the balance of the Debt not then due, unimpaired and without loss of priority;

(d) sell for cash or upon credit the Property or any part thereof and all estate, claim, demand, right, title and interest of Mortgagor therein and rights of redemption thereof, pursuant to power of sale or otherwise, at one or more sales, as an entirety or in parcels, at such time and place, upon such terms and after such notice thereof as may be required or permitted by law;

(e) institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein, in the Note, the Loan Agreement or in the other Loan Documents;

(f) recover judgment on the Note either before, during or after any proceedings for the enforcement of this Security Instrument or the other Loan Documents;

(g) apply for the appointment of a receiver, trustee, liquidator or conservator of the Property, without notice and without regard for the adequacy of the security for the Debt and without regard for the solvency of Mortgagor or any other Person liable for the payment of the Debt;

(h) the license granted to Mortgagor under Section 1.2 hereof shall automatically be revoked and Lender may enter into or upon the Property, either personally or by its agents, nominees or attorneys and dispossess Mortgagor and its agents and servants therefrom, without liability for trespass, damages or otherwise and exclude Mortgagor and its agents or servants wholly therefrom, and take possession of all books, records and accounts relating thereto and Mortgagor agrees to surrender possession of the Property and of such books, records and accounts to Lender upon demand, and thereupon Lender may (i) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every part of the Property and conduct the business thereat; (ii) complete any construction on the Property in such manner and form as Lender deems advisable;

(iii) make alterations, additions, renewals, replacements and improvements to or on the Property; (iv) exercise all rights and powers of Mortgagor with respect to the Property, whether in the name of Mortgagor or otherwise, including, without limitation, the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents of the Property and every part thereof; (v) require Mortgagor to pay monthly in advance to Lender, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of such part of the Property as may be occupied by Mortgagor; (vi) require Mortgagor to vacate and surrender possession of the Property to Lender or to such receiver and, in default thereof, Mortgagor may be evicted by summary proceedings or otherwise; and (vii) apply the receipts from the Property to the payment of the Debt, in such order, priority and proportions as Lender shall deem appropriate in its sole discretion after deducting therefrom all actual out-of-pocket expenses (including reasonable attorneys' fees) incurred in connection with the aforesaid operations and all amounts necessary to pay the Taxes, Other Charges, insurance and other expenses in connection with the Property, as well as just and reasonable compensation for the services of Lender, its counsel, agents and employees;

(i) exercise any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including, without limiting the generality of the foregoing: (i) the right to take possession of the Personal Property or any part thereof, and to take such other measures as Lender may deem reasonably necessary for the care, protection and preservation of the Personal Property, and (ii) request Mortgagor at its expense to assemble the Personal Property and make it available to Lender at a convenient place acceptable to Lender. Any notice of sale, disposition or other intended action by Lender with respect to the Personal Property sent to Mortgagor in accordance with the provisions hereof at least ten (10) days prior to such action shall constitute commercially reasonable notice to Mortgagor;

(j) apply any sums then deposited or held in escrow or otherwise by or on behalf of Lender in accordance with the terms of the Loan Agreement, this Security Instrument or any other Loan Document to the payment of the following items in any order in its uncontrolled discretion: (i) Taxes and Other Charges; (ii) Insurance Premiums; (iii) interest on the unpaid principal balance of the Note; (iv) amortization of the unpaid principal balance of the Note; (v) all other sums payable pursuant to the Note, the Loan Agreement, this Security Instrument and the other Loan Documents, including without limitation advances made by Lender pursuant to the terms of this Security Instrument;

(k) surrender the Policies maintained pursuant to the Loan Agreement, collect the unearned insurance premiums for the Policies and apply such sums as a credit on the Debt in such priority and proportion as Lender in its discretion shall deem proper, and in connection therewith, Mortgagor hereby appoints

Lender as agent and attorney-in-fact (which is coupled with an interest and is therefore irrevocable) for Mortgagor to collect such insurance premiums;

(l) apply the undisbursed balance of any Net Proceeds Deficiency deposit, together with interest thereon, to the payment of the Debt in such order, priority and proportions as Lender shall deem to be appropriate in its discretion; or

(m) pursue such other remedies as Lender may have under applicable law. In the event of a sale, by foreclosure, power of sale or otherwise, of less than all of Property, this Security Instrument shall continue as a lien and security interest on the remaining portion of the Property unimpaired and without loss of priority. Notwithstanding the provisions of this Section to the contrary, if any Event of Default as described in Section 11.l(f) of the Loan Agreement shall occur, the entire unpaid Debt shall be automatically due and payable, without any further notice, demand or other action by Lender.

47.     The AL&R provides, *inter alia*:

## ARTICLE 1 – ASSIGNMENT

**Section 1.1 <u>Property Assigned</u>**.  Assignor hereby absolutely and unconditionally assigns and grants to Lender, the following property, rights, interests and estates, now owned, or hereafter acquired by Assignor:

(a) Leases. All leases, subleases or subsubleases, lettings, licenses, concessions or other agreements made a part thereof (whether written or oral and whether now or hereafter in effect), other than the Ground Lease pursuant to which any Person is granted a possessory interest in, or a right to use or occupy, all or any portion of any space in that certain lot or piece of land, more particularly described in Exhibit A annexed hereto and made a part hereof, together with the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter located thereon (collectively, the "Property") and every modification, amendment or other agreement relating to such leases, subleases, subsubleases, or other agreements entered into in connection with such leases, subleases, subsubleases, or other agreements and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto, and the right, title and interest of Assignor, its successors and assigns, therein and thereunder.

(b) Other Leases and Agreements. All other leases and other agreements, whether or not in writing, affecting the use, enjoyment or occupancy of Assignor's leasehold interest in the Property or any portion thereof now or hereafter made, whether made before or after the filing by or against Assignor of any petition for relief under the Bankruptcy Code together with any extension, renewal or

replacement of the same. This Assignment of other present and future leases and present and future agreements being effective without further or supplemental assignment. The "leases" described in Subsection l. l(a) and the leases and other agreements described in this Subsection l. l(b) are collectively referred to as the "Leases."

(c) Rents. All rents, rent equivalents, income, receivables, revenues, receipts, insurance proceeds, deposits and profits arising from the Leases and renewals thereof together with all rents, rent equivalents, income, fees, receivables, accounts, profits (including, but not limited to, all oil and gas or other mineral royalties and bonuses), charges for services rendered and any and all payment and consideration of whatever form or nature received by Assignor or its agents or employees from any and all sources relating to the use, enjoyment and occupancy of the Property whether paid or accruing before or after the filing by or against Assignor of any petition for relief under the Bankruptcy Code (collectively, the "Rents").

(d) Bankruptcy Claims. All of Assignor's claims and rights (the "Bankruptcy Claims") to the payment of damages arising from any rejection by a lessee of any Lease under the Bankruptcy Code.

(e) Lease Guaranties. All of Assignor's right, title and interest in and claims under any and all lease guaranties, letters of credit and any other credit support (individually, a "Lease Guaranty," collectively, the "Lease Guaranties") given by any guarantor in connection with any of the Leases or leasing commissions (individually, a "Lease Guarantor," collectively, the "Lease Guarantors") to Assignor.

(f) Proceeds. All proceeds from the sale or other disposition of the Leases, the Rents, the Lease Guaranties and the Bankruptcy Claims.

(g) Other. All rights, powers, privileges, options and other benefits of Assignor as lessor under the Leases and beneficiary under the Lease Guaranties, including without limitation the immediate and continuing right to make claim for, receive and collect all Rents payable or receivable under the Leases and all sums payable under the Lease Guaranties or pursuant thereto (and to apply the same to the payment of the Debt or the Other Obligations), and to do all other things which Assignor or any lessor is or may become entitled to do under the Leases or the Lease Guaranties.

(h) Entry. The right, at Lender's option, upon revocation of the license granted herein, to enter upon the Property in person, by agent or by court-appointed receiver, to collect the Rents.

(i) Power of Attorney. Assignor's irrevocable power of attorney, coupled with an interest, to take any and all of the actions set forth in Section 3 .1 of this Assignment and any or all other actions designated by Lender for the proper management and preservation of the Property.

(j) Other Rights and Agreements. Any and all other rights of Assignor in and to the items set forth in subsections (a) through (i) above, and all amendments, modifications, replacements, renewals and substitutions thereof.

## ARTICLE 2 – TERMS OF ASSIGNMENT

**Section 2.1 <u>Present Assignment and Lease Back</u>**.  It is intended by Assignor that this Assignment constitute a present, absolute assignment of the Leases, Rents, Lease Guaranties and Bankruptcy Claims, and not an assignment for additional security only. The Leases, Rents, Lease Guaranties and Bankruptcy Claims are hereby assigned absolutely by Assignor to Lender effective immediately and without possession. Nevertheless, subject to the terms of this Section 2.1 and Lender's right to take all other actions with respect to the Leases and Rents under the terms and provisions of the Loan Agreement and the other Loan Documents, Lender grants to Assignor a revocable license to collect, receive, use and enjoy the Rents and all sums due under the Lease Guaranties and Assignor shall hold such Rents and all sums received pursuant to any Lease Guaranty, or a portion thereof sufficient to discharge all current sums due on the Debt, in trust for the benefit of Lender for use in the payment of such sums.

***

## ARTICLE 3 – REMEDIES

**Section 3.1  <u>Remedies of Lender</u>**.  Upon or at any time after the occurrence and during the continuance of an Event of Default, the license granted to Assignor in Section 2.1 of this Assignment shall automatically be revoked, and Lender shall immediately be entitled to possession of all Rents and sums due under any Lease Guaranties, whether or not Lender enters upon or takes control of the Property. In addition, Lender may, at its option, without waiving such Event of Default, without regard to the adequacy of the security for the Debt, either in person or by agent, nominee or attorney, with or without bringing any action or proceeding, or by a receiver appointed by a court, dispossess Assignor and its agents and servants from the Property, without liability for trespass, damages or otherwise and exclude Assignor and its agents or servants wholly therefrom, and take possession of the Property and all books, records and accounts relating thereto and have, hold, manage, lease and operate the Property on such terms and for such period of time as Lender may deem proper and either with or without taking possession of the Property in its own name, demand, sue for or otherwise collect and receive all Rents and sums due under all Lease Guaranties, including

those past due and unpaid with full power to make from time to time all alterations, renovations, repairs or replacements thereto or thereof as Lender may deem proper and may apply the Rents and sums received pursuant to any Lease Guaranties to the payment of the following in such order and proportion as Lender in its sole discretion may determine, any law, custom or use to the contrary notwithstanding: (a) all expenses of managing and securing the Property, including, without being limited thereto, the salaries, fees and wages of a managing agent and such other employees or agents as Lender may deem necessary or desirable and all expenses of operating and maintaining the Property, including, without being limited thereto, all taxes, charges, claims, assessments, water charges, sewer rents and any other liens, and premiums for all insurance which Lender may deem necessary or desirable, and the cost of all alterations, renovations, repairs or replacements, and all expenses incident to taking and retaining possession of the Property; and (b) the Debt, together with all costs and reasonable attorneys' fees. In addition, upon the occurrence and during the continuance of an Event of Default, Lender, at its option, may (1) complete any construction on the Property in such manner and form as Lender deems advisable, (2) exercise all rights and powers of Assignor, including, without limitation, the right to negotiate, execute, cancel, enforce or modify any Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents from the Property and all sums due under any Lease Guaranties, (3) require Assignor to pay monthly in advance to Lender, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupancy of such part of the Property as may be in possession of Assignor or (4) require Assignor to vacate and surrender possession of the Property to Lender or to such receiver and, in default thereof, Assignor may be evicted by summary proceedings or otherwise.

***

**Financing Statements**

48.     As described herein, Plaintiff has valid and enforceable security interests in the Property.

49.     To further perfect its interest in the Property, on November 10, 2010, Original Lender filed a Uniform Commercial Code Financing Statement with the Office of the New York City Register as CFRN 2010000382129 (the "UCC-1").

50.     By Uniform Commercial Code Financing Statement Amendment filed with the Office of the New York City Register on April 1, 2011 as CFRN 2011000118309, Original

Lender assigned the UCC-1 to BANK OF AMERICA MORTGAGE CAPITAL CORPORATION.

51.     By Uniform Commercial Code Financing Statement Amendment filed with the Office of the New York City Register on April 20, 2011 as CFRN 2011000144545, BANK OF AMERICA MORTGAGE CAPITAL CORPORATION assigned the UCC-1 to Plaintiff.

52.     Additionally, on July 1, 2015, Plaintiff filed a Uniform Commercial Code Continuation with the Office of the New York City Register as CFRN 2015000225832 (the "UCC Continuation").

53.     Plaintiff holds a duly perfected security interest in the Property by virtue of the recorded Mortgage, the recorded County UCC-1, the filed State UCC-1, and the subsequent assignments and continuations thereof.

**Events of Default**

54.     One or more Events of Default has or have occurred under the Loan Documents (the "Existing Events of Default") and Mortgagor has acknowledged such Existing Events of Default.  Such Existing Events of Default are continuing and have not been cured as of the date hereof.

55.     As of the date of this complaint, Borrower and Mortgagor have failed to satisfy the obligations of Borrower and Mortgagor, applicable, under the Loan Documents.  As a result, there is now due and owing to Plaintiff, an unpaid principal balance in excess of [ ] plus accrued and paid interest at the rates set forth in the Note, together with such other amounts due and owing under the Loan Documents, including, without limitation, late payment charges and Plaintiff's reasonable attorneys' fees and costs.

**The Stipulation**

56.     Plaintiff has engaged in extensive discussions with Borrower and Mortgagor prior to the commencement of this action.  As a result of these discussions, Plaintiff, Borrower and Mortgagor have agreed to the immediate appointment of a receiver by the Court.

57.     In summary, pursuant to the Stipulation:  (a) Borrower and Mortgagor acknowledge that an Event of Default exists and is continuing pursuant to section 11.1 of the Loan Agreement; (b) as a result of such Event of Default, Plaintiff is entitled to the appointment of a receiver pursuant to and in accordance with the terms of section 8.1(g) of the Mortgage; (c) Borrower and Mortgagor consent to the entry of a proposed order, substantially in the form annexed as Exhibit 1 to the Stipulation, providing for the appointment of a receiver for the Property;  and (d) subject to the approval of the Court, the parties agree and acknowledge that Jeffrey Kolessar of GF Hotels & Resorts is qualified to serve as receiver and have no objection to the appointment of Kolessar as receiver on the terms and conditions described in the accompanying Declaration of Jeffrey Kolessar in support of Plaintiff's Motion for an Order Appointing a Receiver, filed contemporaneously herewith.

58.     In the absence of a receiver, Plaintiff's legal remedies would be inadequate.  The loan at issue is non-recourse, unless Borrower or any of certain related parties has engaged in certain "bad boy" acts that would trigger full or partial recourse liability, as more particularly set forth in the Loan Agreement.  Thus, Plaintiff as a general matter must look solely to foreclose the Property in order to recover on the Loan.  A receiver is needed to immediately to conserve, stabilize and manage the Property and to pay Project Expenses (as defined and as more particularly provided for in the Stipulation) until this lawsuit is resolved or until Plaintiff coordinates and completes the foreclosure process or other disposition of the Property.

## STATUTORY ALLEGATIONS

59.     No other action has been commenced by Plaintiff for the recovery of the sum

evidenced by the Note and secured by the Mortgage.

60.     This action does not seek to foreclose a high cost loan, subprime loan or other

non-traditional mortgage, because, among other things, this is commercial property and

Borrower is not a natural person (see N.Y. Banking Law § 6-l(e)(ii)), nor was the debt incurred

by Borrower "primarily for personal, family or household purposes" (see N.Y. Banking Law § 6-

l(e)(iii)).  Accordingly, the provisions of RPAPL §§ 1302 and 1304 (with respect to the 90-day

pre-action notice) and NYCRR § 202.12-a (with respect to mandatory conferences) do not apply

here.

61.     That each and all of the Defendants (other than Defendants John Does #1-50)

herein have or claim to have some interest in, or lien upon the premises or some part thereof,

which interest or lien, if any, is subject and subordinate to the lien of Plaintiff's Mortgage sought

to be foreclosed in this action.

62.     That Plaintiff shall not be deemed to have waived, altered, released or changed

the election hereinbefore made by reason of any payments made after the date of commencement

of this action.

63.     Pursuant to the terms of the Loan Documents, Plaintiff elects to have all Real

Property and Personal Property comprising the Property (excluding cash held in reserves,

escrows and similar accounts held by or on behalf of Plaintiff) sold at a single public sale.

64.     Based upon the foregoing, the Property (excluding cash held in reserves, escrows

and similar accounts held by or on behalf of Plaintiff) should be sold subject to covenants and

restrictions, easements and agreements of record, to any state of facts an accurate survey might show, and to taxes, assessments, sewer rents and water charges, if any.

WHEREFORE, Plaintiff Lender demands judgment that:

(i).    Defendants and all persons claiming under them or any of them subsequent to the commencement of this action and the filing of a notice of pendency thereof, be barred and foreclosed of and from all estate, right, title and interest, claim, lien and equity of redemption of, in and to: (A) the Property more particularly described in this Verified Foreclosure Complaint, including any personal property appurtenant thereto, (B) any and all leases, licenses and/or occupancy agreements of any kind or nature in or to the Property or any portion thereof;

(ii).    The interests in the Property (excluding cash held in reserves, escrows and similar accounts) of Defendants Borrower and Mortgagor be ordered sold at a single sale according to law and, to the extent required, a declaration that the Personal Property be sold along with the Real Property and that all right, title and interest in cash held in reserves, escrows and similar accounts be vested in Plaintiff or its designee or nominee; the monies arising from the sale thereof be brought into Court; from the net proceeds of such sale, Plaintiff be paid (a) the amount due on the Note, together with the accrued interest thereon as set forth above; (b) costs, allowances and disbursements of this action; (c) a sum in respect of reasonable attorneys' fees incurred by Plaintiff in connection with the collection of the indebtedness secured by the Mortgage, and the foreclosure thereof; and (d) any amounts advanced and paid pursuant to the terms and provisions of the Mortgage and Note, including, without limitation, taxes, water rates and sewer rents, insurance premiums and all other charges and liens upon the aforesaid leasehold, with interest on said amounts from the dates of the respective payments and advances thereof;

(iii).    Defendants John Doe #1 through John Doe #50 (fictitious names) be adjudged to have received Rents improperly to the extent received on or after an Event of Default, be directed to disgorge all such Rents and to over same, with interest thereon, to Plaintiff;

(iv).    Upon Plaintiff's application therefor, this Court appoint a receiver of the rents and profits of the Property during the pendency of this action with the usual powers and duties; and

(v).     Plaintiff have such other and further relief as may be just and equitable.

Dated:     New York, New York
           May 7, 2020

                                        ALLEGAERT BERGER & VOGEL LLP

                                        By: _____s/Partha P. Chattoraj_____
                                                Lawrence P. Gottesman
                                                Partha P. Chattoraj
                                                Bianca Lin

                                        111 Broadway, 20th Floor
                                        New York, New York 10006
                                        Tel.: (212) 571-0550
                                        Fax: (212) 571-0555

                                        *Attorneys for Plaintiff*

**SCHEDULE A**

**DESCRIPTION OF MORTGAGED LAND**

PARCEL A (As to the Lease)

ALL that certain plot, piece or parcel of land, situated, lying and being in the Borough of Manhattan, County, City and State of New York lying at and above a horizontal plane drawn at elevation 225.35 feet, bounded and described as follows:

BEGINNING at a point in the southerly line of West 42nd Street distant 202 feet, 10 inches easterly from the comer formed by the intersection of the southerly line of West 42nd Street with the easterly line of Eighth Avenue:

1. RUNNING THENCE easterly, along the southerly line of West 42nd Street, 297 feet, 2 inches;

2. THENCE southerly, parallel with the easterly line of Eighth Avenue, 197 feet, 6 inches to a point in the northerly line of West 41st Street;

3. THENCE westerly, along the northerly line of West 41st Street, 250 feet, 0 inches;

4. THENCE northerly, parallel with the easterly line of Eighth Avenue, 98 feet, 9 inches to a point in the center line of block;

5. THENCE westerly, along the center line of block and parallel with the northerly line of West 41st Street, 47 feet, 2 inches;

6. THENCE northerly, parallel with the easterly line of Eighth Avenue, 98 feet, 9 inches to the point or place of BEGINNING.

Elevations are actual and refer to the datum used by the Topographical Bureau, Borough of Manhattan, which is 2.75 feet above the National Geodetic Survey Vertical Datum of 1929 (United States Coast and Geodetic Survey) mean sea level, Sandy Hook, New Jersey.

Together with the benefits of the reciprocal easements set forth in a Declaration of Easement and Operating Agreement dated as of November 5, 1998, by and between The City of New York and 42nd St. Development Project, Inc., a subsidiary of New York State Urban Development Corporation, d/b/a Empire State Development Corporation, and recorded in the Office of the New York City Register, New York County, on January 6, 1999, in Reel 2788, page 366.

Together with the benefits of the reciprocal easements permitting the existence of Common Elements located or hereafter located on the described premises set forth in a Site 8 Hotel Declaration of Covenants and Easements dated as of November 5, 1998 by 42nd St. Development Project, Inc., a wholly owned subsidiary of New York State Urban Development Corporation, d/b/a Empire State Development Corporation, and executed and approved by the City of New York, and recorded in the Office of the New York City Register, New York County, on January 6, 1999, in Reel 2788, page 646.

Parcel B (As to the Sublease)

ALL that certain, plot, piece or parcel of land, situated, lying and being in the Borough of Manhattan, County, City and State of New York lying at and above a horizontal plane drawn at elevation 225.35 feet, bounded and described as follows:

BEGINNING at a point on the northerly side of 41st Street, distant 300 feet easterly from the corner formed by the intersection of the northerly side of 41st Street with the easterly side of Eighth Avenue:

1) RUNNING THENCE northerly, parallel with Eighth Avenue part of the way through a party wall 98 feet, 9 inches to the center line of the block;

2) THENCE easterly along the center line of the block 80 feet;

3) THENCE northerly, parallel with Eighth Avenue part of the way through a party wall 98 feet, 9 inches to the southerly side of 42nd Street;

4) THENCE easterly along the southerly side of 42nd Street 20 feet;

5) THENCE southerly parallel with Eighth Avenue and part of the way through a party wall 197 feet 6 inches to the northerly side of 41st Street; and

6) THENCE westerly along the northerly side of 41st Street 100 feet to the point or place of BEGINNING.

Elevations are actual and refer to the datum used by the Topographical Bureau, Borough of Manhattan, which is 2.75 feet above the National Geodetic Survey Vertical Datum of 1929 (United States Coast and Geodetic Survey) mean sea level, Sandy Hook, New Jersey.

For information: Section 4   Block 1013   Lot 9012

## **VERIFICATION**

JORGE RODRIGUEZ hereby declares as follows, pursuant to 28 U.S.C. § 1746:

1. I am a Vice President for Torchlight Loan Services, LLC, the special servicer and attorney-in-fact for Plaintiff, Wells Fargo Bank, National Association, as Trustee for the Registered Holders of Morgan Stanley Capital I Inc., Commercial Mortgage Pass-Through Certificates, Series 2011-C1. I have read the foregoing Verified Complaint, know the contents thereof, and state that the same are true to my knowledge, except as to those matters therein stated to be alleged on information and belief, and as to those matters, I believe them to be true.

2. The ground of my belief as to all matters in the foregoing Verified Complaint not stated upon my knowledge is information acquired from the books and records of Plaintiff or one or more of its servicers.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on May 1, 2020.

Jorge Rodriguez